Filed 1/19/22  P. v. Romero CA6
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JULIAN DANIEL ROMERO,<br><br>    Defendant and Appellant. | H047034<br>(Santa Clara County<br>Super. Ct. No. C1777217) |

Defendant Julian Daniel Romero was convicted by a jury of three counts of aggravated sexual assault on a child under 14 (Pen. Code, § 269, subd. (a)(1), (a)(4), (a)(5))**[1]**, 10 counts of lewd act on a child under 14 (§ 288, subd. (a)), and six counts of lewd act on a child 14 or 15 years of age (§ 288, subd. (c)(1)).  The court found true one-strike allegations (§ 667.61(d)) as to the lewd act on a child under 14 counts and two prior strike conviction allegations (§ 1170.12).  Defendant was sentenced to 900 years to life.

On appeal, defendant contends that (1) the aggravated sexual assault counts are not supported by substantial evidence of force, duress, or fear, (2) the trial court prejudicially erred in failing to instruct on any lesser included offenses as to the aggravated sexual assault counts, (3) the trial court prejudicially erred in excluding

---

**[1]** All further statutory references are to the Penal Code unless otherwise indicated.

defense evidence related to the victim's sexual relationships with other adult men, (4) the trial court prejudicially erred in admitting evidence under Evidence Code section 1108 of defendant's prior sex offenses, (5) the trial court prejudicially erred in admitting evidence under Evidence Code section 1101, subdivision (b) of defendant's prior sexual conduct, (6) the trial court prejudicially erred in instructing the jury with CALCRIM No. 1193 regarding the permissible uses of the prosecution expert's testimony about child sexual abuse accommodation syndrome (CSAAS), (7) the prosecutor committed misconduct by vouching for the victim's credibility, (8) the alleged errors were cumulatively prejudicial, and (9) defendant's sentence of 900 years to life is unconstitutionally cruel and unusual punishment. In a petition for rehearing, defendant contends that we must remand this case to give the trial court the opportunity to exercise the discretion granted to it under newly amended section 654. We reject all of his other contentions, but we agree that a remand is required to allow the trial court to exercise this newly granted discretion.

## I.     THE PROSECUTION'S EVIDENCE

In 1999, defendant was convicted of committing a lewd act on a child under 14 on 13-year-old M.D. and annoying or molesting 14-year-old J.D. B. was born in 2000.[2] Defendant is B.'s mother's first cousin, and he is about B.'s mother's age.

B. first met defendant when she was four years old. Defendant lived with his mother in an apartment on Harlow Way from July 2008 to October 2015. B. and her family lived at the Harlow Way apartment from September 2008 to November 2009 when B. was around nine years old and in fourth grade. While she was living at the Harlow Way apartment, B. and defendant watched movies together and played on his Xbox.

---

[2] B. was 18 years old at the time of trial.

Not long after B. began living at the Harlow Way apartment, defendant began sexually abusing her. The abuse continued after B. and her family moved to a residence on Hillsdale Avenue before B. started fifth grade. Defendant came over to the Hillsdale Avenue residence regularly. Defendant and B. were "friends, kind of." They played video games and talked. Defendant told B. about his prior convictions and said "that he did do stuff with the girl, but it wasn't as dramatic as people made it seem and he didn't deserve to be locked up for it." Defendant told B. he had "fingered" the girl and that her parents "were okay with it." He also told B. that he had had sex with "underage girls."

Defendant made comments to B. about her classmates' breasts and said he "would have sex with them." When B. wanted to use defendant's computer or Xbox, he required her to give him a massage. During some of these massages, he would put his feet on her breasts.[3] When B. was 11 or 12 years old, defendant lifted up her shirt, put his hands on her breasts, and sucked on her breasts. This happened more than 20 times. Defendant also repeatedly complimented her breasts. Although B. told him that she thought this conduct was wrong because they were cousins, he "brushed it off like it was nothing . . . ." When B. was 12 years old, defendant "brought up my virginity" and told her "I should know how to do it for a guy." He began touching her vagina outside her clothing and then inside her clothing. Eventually, he put his fingers inside her vagina.

At some point, defendant asked B. to give him oral sex. He put his penis in her mouth and "coach[ed]" her on "how to do it" the way he liked. She subsequently told

---

[3] B. was unclear in her testimony about when these events began. She testified that they started when she was in fifth grade and aged 10 or 11, but she also testified that they started soon after she moved into the Harlow Way apartment. She testified that some of the acts of sexual abuse took place at the Harlow Way apartment when she was 11 or 12 years old. B. also testified that she was "not a hundred percent sure" whether she was living at the Harlow Way apartment when the abuse took place there.

him that this was "gross" and "weird," but defendant told her that he had "almost done it with other family members and stuff." The oral sex happened many times.

Defendant also had sexual intercourse with her, beginning when she was 12 years old. The first time, he had her bend over, and he put his penis in her vagina from behind. When he was done, he asked her if she liked it. She told him yes because she thought that was what she was supposed to think. He had sexual intercourse with her more than 20 times.

When B. was 15 years old, defendant took her to Universal Studios in Los Angeles. She knew that they were going to have sex on this trip. Although she did not want to have sex with him, she wanted to go to Universal Studios. They had sex at least five times in a hotel room on this trip.

Defendant's sexual abuse of B. took place at numerous locations: at the Harlow Way apartment, "[i]n his car, at his girlfriend's house, in LA, at my house, [and] at the old house I used to live in." Defendant would come to the Hillsdale Avenue residence to "hang out" when B. was 13 years old, and he would have sex with her when other people were sleeping. This happened at least twice.

When B. was 13 years old, defendant bought lingerie for her because "[h]e wanted me to look sexy . . . in the bedroom." He told her not to tell anyone about the abuse because he would "go to jail" due to his prior convictions. B. was "scared" to disclose the abuse because she "[did]n't know what would have happened." She "thought everyone wouldn't believe me, and he would find out that I said something and I will be in trouble." Defendant had told her that he had "a list of people that if anything were to happen, he would kill them . . . ." On this list were "[m]ostly everyone he knows," and "[t]here was not really anyone who's not on the list." B. felt powerless to stop defendant's conduct because she assumed that others "already knew" and "just didn't care." She believed this because defendant openly made

4

comments about wanting to have sex with other family members, and no one would say anything about these comments.

The first time B. told anyone about defendant's sexual abuse of her was in 2015 when she told her adult boyfriend, Jose. When B. was 16 years old, she "realized" that defendant "was a very unstable person," and she became afraid of him and ceased all contact with him. In July 2017, at age 17, B. told her mother about defendant's sexual abuse of her. B. was going through a break-up with her boyfriend at that time and was upset about that. She had been afraid to disclose defendant's abuse because she "thought they were going to think I'm lying . . . because he's a good manipulator." B.'s mother wanted her to report the abuse to the police immediately, but B. was reluctant to do so. In September 2017, B. finally spoke to the police about defendant's sexual abuse of her.

B.'s sister, A.D., who is five years older than B., testified that defendant made sexual comments to her when she was 12 or 13 years old. She also testified that defendant was interested in A.D.'s friend, B.X., who was the same age as A.D.[4] A.D. saw defendant and B.X. lying on the couch with a blanket over them. Defendant told A.D. that he had taken B.X. to Santa Cruz and "ended up fingering her." He said that he "liked that she was young and wasn't too developed" because he "really liked" her "little girl's body." Defendant "said many times [to A.D. that] he likes young girls" and "likes young pussy." He made comments like this in front of A.D.'s mother, and A.D.'s mother had no reaction. A.D. talked to her mother about these comments, and her mother told her to "ignore him."

A police officer testified that in 1999 defendant, who was then 19 years old, admitted that he had had a relationship with 13-year-old M.D. and that he knew she

---

[4] This prior victim's last name was "unknown." Since this prior victim and the current victim share the same first initial, we will refer to this prior victim as B.X.

5

was 13 years old at the time. Defendant told the police officer that he had " 'sucked on' " M.D.'s breasts twice and had also put his fingers in her vagina. M.D. had masturbated him. He also admitted that he had threatened to kill M.D. or beat her up.

J.D. was a friend of M.D., and M.D. introduced her to defendant. J.D. testified that when she was 14 years old, defendant called J.D. on the phone, talked to her about sex acts that he had engaged in with others, and said he wanted to engage in sex acts with her. She was uncomfortable and said no. Defendant threatened to harm her or her family, and he said "he knew people who would kill me, or he knew people that would kill my family." He also said "he himself wouldn't mind killing me or my family." In 1999, defendant told the police officer that J.D. had told him she was 13 years old when they met. He admitted to the officer that he had asked J.D. if he could see and " 'suck on' " her breasts.

L.D. testified that defendant was her cousin and that they had grown up together. Defendant was at least five years older than L.D. She exchanged letters with defendant while he was in prison. When she was 15 years old, he wrote to her in a letter from prison that he wanted to touch her breasts and "mess around" with her.

## II.    THE DEFENSE CASE

Defendant testified at trial that "I'm innocent." Defendant described his relationship with B. as mainly centering on their shared interest in video games. He denied any sexual interest in her, and he testified that he had never engaged in any sexual activity with her. However, he admitted that he and B. were home alone together at times. And he admitted that he required other members of the household to give him foot massages if they wanted to use his electronics.

Defendant testified that he treated B. like she was his daughter and looked out for her. He admitted taking B. to Universal Studios and staying in a hotel room with her, but he insisted that they slept in separate beds and engaged in no sexual conduct. Defendant testified that he had told B. about his prior convictions when she was

6

15 years old. He told her: "[S]omeone can call the cops and say anything they want and there doesn't have to be no evidence no nothing. They will just take their word on what they say because I have a history."

Defendant denied any memory of B.X. He also denied making any sexual comments to A.D. Defendant testified that he did make comments about women's bodies, but these were all about adult women in their 30s, 40s, or 50s. He denied any interest in underaged girls. Defendant admitted that he had made the statements to the police officer in 1999 admitting his prior offenses and that he had pleaded guilty to those charges because he was guilty. Although he claimed no recollection of the conduct that J.D. had testified to, he admitted that he had pleaded guilty to that conduct too because he was guilty of it. He admitted writing the letter that L.D. described in her testimony. Defendant claimed that he did not intend to do the things he described.

Defendant testified that he was released from prison at age 22, and, by the time he was 29, he felt like a different person. He had become a father and had "a life" and "a job." Defendant testified that he "took every precaution" not to get into trouble again. Yet in 2008 he was convicted of battery on a cohabitant. It was only in 2010, when his daughter, R., was born, that he changed. His daughter J. was born in 2011.

On cross-examination, he admitted that the battery he committed had been on his former girlfriend while she was pregnant with his first daughter. He admitted that he had been sexually attracted to 13-year-old M.D. and that he had threatened to beat and kill her. Defendant also admitted that he had been sexually attracted to 13 or 14-year-old J.D. and that he had called her on the phone daily for a month and talked about sexual conduct and what sexual acts he wanted to engage in with her. He admitted to a sexual interest in L.D. On redirect, defendant testified that after he got older he was no longer attracted to young girls.

7

Defendant's trial counsel elicited B.'s testimony on cross-examination that she knew that defendant had prior convictions and that he had told her that "all someone would have to do is make an accusation against him and it would be believed because of his past." B. noted that her mother believed that defendant had been "innocent" of those prior convictions. Defendant's trial counsel also questioned B. about her 2014 police interview. B. testified that she did not disclose defendant's sexual abuse of her during the 2014 interview even though the abuse was still ongoing at that time.

B. also testified on cross-examination that she had met her adult boyfriend, Jose Osegueda, in 2015, when B. was 15 years old. After a three-year relationship, B. and Osegueda broke up in 2017. B. was "pretty upset" and "suicidal," and she wanted to get back together with Osegueda. She knew that dating Osegueda was "illegal," and she did not want him to be reported to the police or arrested. However, B. testified that she was not afraid that her mother would report Osegueda to the police because her mother had not done so previously.[5] It was stipulated that B.'s mother reported Osegueda to law enforcement in February 2018.

Defendant's trial counsel argued to the jury that B. had lied about defendant's abuse of her because, in July 2017, "she need to deflect" in order to "turn her mom's attention away from" Osegueda, with whom B. wanted to reconcile. She argued that B. had accused defendant because it was "convenient" and she would be believed due to his "past." Even though B.'s mother later did report Osegueda to the police, defendant's trial counsel argued that B. "couldn't take back" her accusations against defendant "because making a false report is a crime," so she "stuck with her story." She argued that B. was "not credible." Defendant's trial counsel emphasized that B.

---

[5] On redirect, B. testified that her mother had known about her relationship with Osegueda for a year before B.'s July 2017 disclosure of defendant's abuse. B. later got back together with Osegueda, but they subsequently broke up again.

had not reported defendant's abuse in 2014 when she had an opportunity to do so during her police interview. She argued that B. was "lying to get what she wanted."

## III. DISCUSSION

### A. *Substantial Evidence of Duress or Fear*

Defendant contends that the prosecution failed to present substantial evidence of force, duress, or fear in support of the three aggravated sexual assault counts, which were the only counts with a force, fear, or duress element.

#### 1. *Background*

The prosecutor argued to the jury that "defendant accomplished the [aggravated sexual assault] act[s] by duress." "[D]uress is your issue." She asked the jury to "look at all of the circumstances, including the age of B[.] at the time and her relationship to the defendant." She emphasized the "power differential," defendant's "intellectual advantage," his "grooming behavior," which the prosecutor characterized as "inherently coercive," the fact that defendant was "bigger and stronger," and the "inherently problematic family dynamic." She argued that the sexual acts had been accomplished by an "implied threat" because B. believed that she would "destroy [defendant's] life" if she reported the abuse, which the prosecutor argued would have been a "hardship" for B. The prosecutor also argued that defendant's "list of names of people he's going to kill if given the chance" constituted "an implied threat here that [B.] could be hurt." The defense sought acquittal on all counts and made no argument about the force, fear, or duress element of the aggravated sexual assault counts.

#### 2. *Analysis*

Defendant contends that there was not substantial evidence that the aggravated sexual assault counts were "accomplished against [the child]'s will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§§ 269, subd. (a)(1) [rape], (a)(4) [oral copulation], (a)(5) [sexual

9

penetration], 261, subd. (a)(2) [rape], 287, subd. (c)(2) [oral copulation], 289, subd. (a) [sexual penetration].)

The prosecution proceeded solely on a duress theory in this case, so we evaluate only whether the prosecution presented substantial evidence of duress. " ' "Duress" has been defined as "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." . . . [D]uress involves psychological coercion. Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes . . . . "Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim" [are] relevant to the existence of duress.' [Citation.]" (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1319-1320 (*Espinoza*).)

Defendant's contention is based on this court's decisions in *People v. Schulz* (1992) 2 Cal.App.4th 999 (*Schultz*) and *Espinoza*. In *Schultz*, the issue was whether there was substantial evidence of duress where the defendant "awakened the victim by grabbing her arm, cornered her while she cried, held her arm, and touched her breasts and vaginal area." (*Id*. at p. 1004.) This court found the evidence sufficient to support a finding of duress: "The victim, then nine years old, was crying while defendant, her adult uncle, restrained and fondled her. On this occasion he took advantage not only of his psychological dominance as an adult authority figure, but also of his physical dominance to overcome her resistance to molestation. This qualifies as duress." (*Id.* at p. 1005.)

In *Espinoza*, on the other hand, this court found insufficient evidence of duress to support a count of lewd conduct by force or duress and a count of attempted rape. The defendant had repeatedly come into his daughter's bedroom at night while she

10

was sleeping, pulled down her pants, and rubbed her breasts and vagina. (*Espinoza*, *supra*, 95 Cal.App.4th at p. 1293.) His daughter did not "do anything" because she was scared and frightened, and she did not report these initial molests because she was afraid that the defendant would "do something." (*Ibid.*) After molesting her several times, defendant came into her bedroom one final time. This final time was the basis for the lewd conduct by force or duress and attempted rape counts. Defendant put his tongue in her mouth, licked her vagina, and tried to put his penis in her vagina. (*Ibid.*) Her only response was that she "moved" and thereby prevented his penis from entering her. The defendant responded by apologizing and asking for her forgiveness. (*Ibid.*)

The trial court found duress based on the victim's "dependence on defendant, the size and age disparities, her limited intellectual level and her fear of defendant." (*Espinoza*, *supra*, 95 Cal.App.4th at p. 1319.) On appeal, this court distinguished its prior decision in *Schultz*: "We agree with this court's conclusion in *Schulz* that, where the defendant grabbed and restrained the nine-year-old distraught victim, cornered her and used his physical dominance in conjunction with his psychological dominance to overcome her resistance, the lewd act was accomplished by duress. However, the evidence before us is substantially different. Defendant did not grab, restrain or corner [his daughter] during the final incident out of which the Penal Code section 288, subdivision (b) count and the attempted rape count arose. [His daughter] did not cry, and she offered no resistance. Instead, defendant simply lewdly touched and attempted intercourse with a victim who made no oral or physical response to his acts." (*Id.* at p. 1320, fn. omitted.) This court noted that "Duress cannot be established unless there is evidence that " 'the victim['s] participation was impelled, at least partly, by an implied threat . . . .' " (*Id.* at p. 1321.)

Defendant argues that the prosecution's evidence did not support a finding of duress under *Schultz* and *Espinoza* because there was no evidence that he "use[d] any

11

implied threats to prevent [B.] from disclosing." He claims that there was no evidence that he made any express or implied threats. Defendant acknowledges B.'s testimony that defendant told her he had "a list of people that *if anything were to happen*, *he would kill them*" and her testimony that this list contained the names of "[m]ostly *everyone he knows*." (Italics added.) However, he argues that this testimony was insufficient to establish duress because B. "never clarified what 'anything were to happen' meant."

" 'We "must accept logical inferences that the [factfinder] might have drawn from the circumstantial evidence. [Citation.]" . . . Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]' [Citation.]" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

It was not necessary for B. to "clarif[y]" the meaning of "anything were to happen" since a rational jury could readily infer that defendant made this threat in order to instill fear in B. that any resistance to or disclosure of his abuse would trigger him to kill her and her family. While B. did not *expressly* link defendant's threat to her acquiescence to the abuse, she did testify that defendant had warned her not to disclose the abuse, and the jury could reasonably infer that his murderous threat was both intended to and did induce her lack of resistance and her failure to disclose the abuse. We therefore reject defendant's substantial evidence challenge to the aggravated sexual assault counts.

### B. Failure to Instruct on Lesser Included Offenses

Defendant contends that the trial court prejudicially erred in failing to instruct on any lesser included offenses as to the aggravated sexual assault counts. He argues that "[i]n counts 1, 2, and 3 [the aggravated sexual assault counts], the jury was only given the option of convicting appellant of forcible sexual offenses, but not any

non-forcible sexual offenses." The Attorney General contends that there was not substantial evidence that defendant committed only non-forcible sexual offenses so no lesser included instructions were necessary.[6] He also argues that any error in failing to instruct on lesser included offenses was harmless.

"California law requires a trial court, sua sponte, to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149.) "However, . . . reversal is not warranted . . . unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred."[7] (*Id.* at p. 149.)

In this case, the record reflects that it is not reasonably probable that the jury would have found duress lacking if only it had been given the option to convict defendant of non-forcible offenses for the three aggravated sexual assault counts. We do not accept the Attorney General's argument that the evidence of duress left no room for doubt. Instead, we base our conclusion on the prosecutor's argument to the jury encouraging it to consider the option of convicting defendant of only non-forcible offenses for those three counts if it had any doubt about the duress element. The prosecutor had elected to base the three aggravated sexual assault counts on the same acts as the first three nonforcible lewd act on a child under 14 counts. When she argued the case to the jury, she explicitly told the jury: "[I]f you have an issue with

---

[6] The Attorney General concedes that unlawful sexual intercourse with a minor (section 261.5) is a lesser included offense of one of the aggravated sexual assault counts (section 269, subdivision (a)(1) [rape]). He also concedes that simple assault and simple battery are lesser included offenses of another of the aggravated sexual assault counts (section 269, subdivision (a)(5) [sexual penetration]).

[7] Defendant's reliance on *People v. Flores* (2007) 147 Cal.App.4th 199 is misplaced because that case concerned the trial court's failure to instruct on reasonable doubt, which the court found implicated the defendant's federal constitutional rights. (*Id.* at p. 217.) Here, the trial court's failure to instruct on lesser included offenses was only state law error.

the duress element, go to Count 4 [the first nonforcible lewd act count] and consider that one." "It may be that you can't agree on Count 1 [the first aggravated sexual assault count], still go to Count 4, okay? [A]nd do that for 5 and 6 [the second and third nonforcible lewd act counts] for the other two acts." By returning verdicts finding defendant guilty of all three aggravated sexual assault counts and the three nonforcible lewd act counts based on the same acts as the aggravated sexual assault counts, the jury plainly indicated that it did not "have an issue with the duress element." The prosecutor let the jury know of the option that defendant claims lesser included instructions would have given it, and the jury rejected that option. Under these circumstances, the trial court's failure to instruct on lesser included offenses as to the aggravated sexual assault counts does not merit reversal.

### C.    Exclusion of Defense Evidence

Defendant asserts that the trial court prejudicially erred by excluding defense evidence related to B.'s sexual relationships with Osegueda and with an adult man named Jones. Although the trial court permitted the defense to adduce some testimony concerning Osegueda, it excluded evidence concerning B.'s relationship with Jones. The defense wanted to introduce evidence that (1) B.'s mother had reported B.'s sexual relationship with Jones to the police in 2014, (2) B.'s 2014 police interview had concerned her sexual relationship with Jones, and (3) B.'s mother's report to the police concerning Osegueda in 2018 occurred after B. was charged with domestic violence against Osegueda.[8]

---

[8] Although defendant claims that evidence that B. had lied about her age to Jones and Osegueda was wrongfully excluded, he does not explain how it supported the defense theory that B. had lied about defendant to deflect her mother's attention from her relationship with Osegueda.

### 1. Background

The defense sought an in limine ruling on the admissibility of several pieces of evidence related to B.'s sexual relationships with Jones and Osegueda that the defense wanted to use to attack her credibility. The defense filed two exhibits under seal containing the evidence that it wished to present because the evidence was potentially subject to Evidence Code section 782.[9] The portion of this evidence at issue on appeal is the following. In 2014, B.'s mother reported to the police that B. was having a sexual relationship with Jones. B. was then interviewed by the police at a special interview center by an officer specially trained concerning sexual crimes against children. During the 2014 interview, B. said nothing about defendant's ongoing sexual abuse of her. In 2015 or 2016, B. met Osegueda through an advertisement she had placed on backpage.com, and she began a sexual relationship with him.[10] In July 2017, B. and Osegueda broke up. Shortly thereafter B. told her mother about defendant's sexual abuse of her.

The defense insisted that Evidence Code section 782 did not apply because the "scope of questions would not address any specific sexual conduct between" B. and Jones or "any sexual conduct between" B. and Osegueda. Defendant's trial counsel initially told the court that she would not be seeking evidence of "any sexual conduct

---

[9] Evidence Code section 782 concerns the procedure for the defense to use if it seeks admission of "evidence of sexual conduct of the complaining witness" that it wishes to offer "to attack the credibility of the complaining witness." (Evid. Code, § 782, subd. (a).)

[10] The defense also claimed it should be able to introduce evidence that B. had initially failed to disclose to the police that it was defendant who had directed her to create a backpage.com account. Backpage.com is a prostitution website. The defense argued that evidence about the delayed disclosure of the backpage.com allegations would help to show that B. was lying to protect Osegueda. The prosecutor asserted that she planned to "completely avoid" the highly prejudicial topic of backpage.com. Defendant's appellate arguments concerning the exclusion of defense evidence do not address the backpage.com evidence, so we do not address it.

that [B.] was involved in with the other person in 2014." "I don't have any desire or intention to allege that she was even in a sexual relationship with these people . . . ." But defense counsel later sought permission to present evidence that B. was "in a sexual relationship" with Osegueda.

At the in limine hearing on this issue, the defense explained that its position at trial would be that B. was "lying," so this evidence was needed to address "why is she lying." Its argument would be that B. made allegations against defendant to "deflect attention and scrutiny away from herself" and Osegueda and that this evidence would be relevant to B.'s credibility. Defense counsel argued that B. had made the accusations against defendant to her mother to deflect her mother's attention so that her mother would not report Osegueda to the police. The defense insisted that it was necessary for it to present evidence that B.'s mother had reported Jones in 2014 because "[i]t's something specific that has happened in her life that she knows her mother will do, not something that, oh, maybe someone will call. I think it's much more specific to this case and provides a basis for her motive."

The prosecutor initially sought exclusion of all of the proffered defense evidence under Evidence Code section 352. However, the prosecutor ultimately did not oppose the admission of some portions of the proposed defense evidence. "It seems to me that this relevance could be brought into evidence by asking B[.] whether or not she had a boyfriend, whether or not she had an adult boyfriend, and whether or not they had a sexual relationship with no details. Then further questioning could be made whether or not she was afraid that her mother would report her boyfriend." In the prosecutor's view, this would provide what the defense sought without "bringing up very, very prejudicial issues."

The court initially ruled that the defense would be allowed to do "some limited questioning concerning the 2014 interview, but in this narrow situation" to show that B. had been interviewed by the police in private in 2014 and had not disclosed

16

defendant's abuse at that time.[11]  This evidence was admissible "to show that she had an opportunity, in a safe environment, to make a disclosure" and "did not do that." The court noted that as "with all of the in limines, they are subject to change, depending on how things go with the trial."  The court later ruled that the defense also could present evidence of the following:  "whether B[.] was involved in an adult—was involved in a relationship with an adult male who was her boyfriend, and during that relationship, she was afraid her mom would report the boyfriend to the police." Defendant's trial counsel then sought clarification from the court as to whether she was "not permitted to ask B[.] any questions about her mom previously calling the police in the 2014 case."  After some discussion, the court ruled that she could ask B.: " 'Did you believe that your mom was very likely to report this [her relationship with Osegueda]?' "  If B. "says 'Yes,' " then the defense would not be permitted to introduce evidence about B.'s mother's 2014 report.  But "[i]f she says 'No,' and you want to go into the prior occasion, I would ask you to please approach before we go into that."  Defendant's trial counsel responded:  "Okay."

At trial, defendant's trial counsel questioned B. about her 2014 police interview, and B. admitted that she did not disclose defendant's sexual abuse of her during the 2014 interview even though the abuse was still ongoing at that time. B. admitted that the 2014 police interview occurred in a "similar room" to the one where her 2017 police interview occurred and, like her 2017 police interview, was an interview with a nonuniformed officer.  B. also conceded that the police "could have stopped" defendant's abuse in 2014 if she had disclosed it.  Defendant's trial counsel

---

[11] The court found the proposed defense evidence concerning Osegueda to be "marginally relevant" and did not permit it to be introduced to show sexual knowledge, and it excluded it under Evidence Code section 352, though it said it might reconsider this ruling after B.'s testimony.  The court excluded evidence regarding the February 2018 arrest of B. (which was what allegedly led to her mother reporting Osegueda to the police).

was also permitted to elicit B.'s testimony that she knew her relationship with Osegueda was "illegal" and that she did not want him to be reported to the police or arrested. Even though she and Osegueda had broken up before she told her mother about defendant's sexual abuse of her, she wanted to get back together with Osegueda. Although B. testified that it was "possible" that her mother wanted to report Osegueda to the police at that time, she insisted that she was not afraid at that point that her mother would report Osegueda to the police because her mother had not done so previously. There is no indication in the record that, at any time during or after B.'s testimony, defendant's trial counsel renewed her request for admission of evidence that B.'s mother had reported Jones to the police in 2014. B.'s mother did not testify at trial.

### 2. Analysis

Defendant's appellate claims are limited to the court's alleged exclusion of evidence that (1) B.'s mother had reported B.'s sexual relationship with Jones to the police in 2014, (2) B.'s 2014 police interview had concerned her sexual relationship with Jones, and (3) B.'s mother's report to the police concerning Osegueda in 2018 occurred after B. was charged with domestic violence against Osegueda.

Defendant claims the allegedly excluded evidence would have supported his contention that, when B. made allegations against defendant in 2017, she had a motive to deflect attention away from both herself and Osegueda. His reasoning is that evidence that B.'s mother had reported Jones to the police in 2014 would have shown that B. had good reason to fear that her mother would report Osegueda in 2017, thereby motivating her to deflect her mother's attention away from Osegueda by making allegations against defendant. He argues that evidence that B.'s 2014 police interview concerned her sexual relationship with Jones would have provided additional support for the defense's challenge to B.'s credibility based on her failure to disclose her allegations against defendant at that time. Finally, defendant argues that evidence

18

that B.'s mother reported Osegueda only after B. was accused of domestic violence against him would have shown that B.'s mother was trying to deflect blame from B.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

We find no error. First, the trial court did not preclude the defense from introducing evidence of B.'s mother's 2014 report of Jones to the police *if* B. testified that she did not think it "very likely" that her mother would report Osegueda to the police in 2017. The trial court expressly gave the defense the option to renew its request if B. so testified. B. then testified that she believed in 2017 that it was *possible* that her mother would report Osegueda but that she did *not* think it likely at that time because her mother had not done so previously. After this testimony, the defense did not renew its request concerning B.'s mother's 2014 report of Jones. Since the trial court's ruling did not preclude the defense from seeking admission of that evidence under these circumstances, the defense's failure to renew its request forfeited this claim. We therefore find that this alleged error has not been preserved for appellate review because the trial court did not exclude this evidence under the circumstances.

Second, we find no abuse of discretion in the trial court's ruling concerning the subject matter of B.'s 2014 police interview. The defense was permitted to introduce evidence of the intimate setting in which that interview took place, and it had a full opportunity to emphasize that B. not only did not disclose defendant's sexual abuse of her to the police in 2014 but also that she knew that the police could have stopped that ongoing abuse if she had reported it then. The additional fact that this police interview concerned allegations of a sexual relationship between her and Jones was of little probative value and posed a high risk of prejudice.

19

Third, defendant fails to explain how evidence of the reason for B.'s *mother's* February 2018 report of Osegueda to the police would have demonstrated anything about *B.'s* credibility. B.'s mother did not testify at trial, so the reasons for her actions after B. disclosed defendant's sexual abuse to her were not at issue.

Defendant was not precluded from presenting evidence in support of his defense. He presented evidence of B.'s illegal relationship with Osegueda and questioned her about whether she was afraid that her mother would report Osegueda to the police. Defendant's trial counsel was permitted to forcefully challenge B.'s testimony that she was not afraid that her mother would report her illegal relationship with Osegueda to the police. The defense also presented evidence that B. had the opportunity to tell the police in 2014 of defendant's sexual abuse of her and that she did not do so even though she knew the police could stop the abuse. And it was stipulated that B.'s mother did in fact report Osegueda to the police in 2018. In this context, the trial court neither abused its discretion nor violated defendant's constitutional rights by making its evidentiary rulings concerning the proffered defense evidence.

Defendant also contends that his trial counsel was prejudicially deficient in failing to preserve for review his claim that the court erred in excluding evidence of B.'s mother's 2014 report of Jones's abuse of B. He argues that there could have been no rational tactical purpose for failing to renew the request for admission of this evidence after B.'s testimony.

"To succeed on an appellate claim of ineffective assistance, a defendant must establish that his trial counsel's performance was deficient and that his defense was prejudiced by the deficiency. [Citations.] 'The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.] Whenever counsel's conduct can be reasonably attributed to sound strategy, a reviewing court will presume that the

20

conduct was the result of a competent tactical decision, and the defendant must overcome that presumption to establish ineffective assistance. [Citation.]" (*People v. Fromuth* (2016) 2 Cal.App.5th 91, 113.)

In this case, defendant has failed to overcome the presumption that his trial counsel made a reasonable and competent tactical decision not to renew the request. His trial counsel had successfully elicited B.'s admission that she did not want her mother to report Osegueda and that it was possible that her mother would do so. This testimony suppported the defense theory. Defendant's trial counsel could have decided that this testimony was sufficient to support the defense theory and that additionally raising the fact that B. had been abused by another man in 2014 might cause the jury to blame defendant for her vulnerability to that abuse, while offering only a small amount of further support for the defense theory that B. was lying about defendant's abuse. Such a decision is inherently tactical. Accordingly, defendant has not established on appeal that his trial counsel was prejudicially deficient in this respect.

### D. *Evidence Code section 1108 Evidence*

Defendant contends that the trial court abused its discretion in failing to find that the Evidence Code section 1108 evidence was more prejudicial than probative.

### 1. *Background*

Defendant moved in limine to bar any evidence the prosecution sought to introduce under Evidence Code section 1108. In 1999, defendant had been convicted of lewd act on a child under 14 (§ 288, subd. (a)) on M.D. He had also committed an annoying or molesting a minor (§ 647.6) offense on J.D. The defense argued that the prior conviction should not come in because the age difference in that case had been only six years, while the age difference here was much more. It made the same argument as to the annoying or molesting offense.

The court weighed the probative value against the potential for prejudice under Evidence Code section 352 and found that the prior offenses were more probative than prejudicial because they involved similarly aged young girls who were not strangers to defendant, and similar conduct, which was not more inflammatory than the charged offenses, led to convictions, and were not remote. The police officer testified at trial about defendant's statements to her in 1999 concerning his sexual acts with 13-year-old M.D. and his interactions with J.D. J.D. also testified at trial about defendant's interactions with her when she was 14 years old.

The jury was instructed: "If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the crimes, as charged here."

### 2. Analysis

Defendant claims that evidence of the 1999 offenses should have been excluded under Evidence Code section 352 because they were not similar to the current offenses. He argues that the prior offenses involved "violent threats," while the current offenses did not, and the prior offenses were committed on young girls who were five or six years younger than him but the current offenses were committed on a young girl who was 21 years younger than him.

A trial court should consider five factors in exercising its discretion under Evidence Code section 352 to exclude prior sex offenses that are admissible under Evidence Code section 1108: "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale;

22

(4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time. [Citation.] A trial court balances this first factor, i.e., the propensity evidence's probative value, against the evidence's prejudicial and time-consuming effects, as measured by the second through fifth factors." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.)

Defendant addresses only the first two factors, perhaps because he recognizes that the other three factors do not provide any support for his contention. He claims that the prior acts were not probative because they were not sufficiently similar to the charged conduct to support an inference that he committed the current offenses. We disagree. The prior offenses were quite similar to the current offenses. B. testified that defendant made violent threats very similar to those he made to M.D. and J.D. Defendant told B. that he would kill nearly everyone he knew if "anything happened." We therefore reject defendant's claim that he "had never threatened" B. For the same reason, we find no merit in his claim that the prior acts were more inflammatory than the current charges because the priors were "violent." Defendant's violent threats against these young girls were one of the threads that wove the prior offenses and the current offenses together.

Defendant's claim that the priors were not probative due to the variance in the age disparity between defendant and his victims lacks substance because the age disparity was of far less significance than the very close correlation in the ages of the victims. Defendant was just under 20 years old in 1999 when he committed the prior offenses on 13-year-old and 14-year-old girls, and he was in his late 20s and 30s when he molested B., largely when she was 11 to 14 years old. We conclude that defendant has failed to demonstrate that the trial court abused its discretion under Evidence Code section 352 in admitting the 1999 offenses under Evidence Code section 1108.

23

### E.    *Evidence Code section 1101, subdivision (b) Evidence*

Defendant contends that the trial court prejudicially abused its discretion in admitting evidence about defendant's sexual interactions with L.D. and B.X. under Evidence Code section 1101, subdivision (b) to show intent, motive, and common scheme or plan.  He claims that this evidence was inadmissible because it was cumulative and more prejudicial than probative.

### 1.    *Background*

Defendant made an in limine motion to bar any evidence of his prior acts under Evidence Code sections 352 and 1101.  He argued that this conduct was not probative on the issue of his intent and that intent was not at issue in this case.  Defendant argued that this proposed evidence was "essentially, bad character evidence" and therefore inadmissible.

The court held an Evidence Code section 402 hearing at which L.D. testified.  L.D. was defendant's cousin.  He was about five years older than her.  While defendant was in prison, he exchanged letters with L.D.  In his final letter from prison to 15-year-old L.D., he said he "wanted to mess around" and to touch her breasts.

As to B.X., the prosecution proposed to have A.D. testify that she heard defendant make inappropriate sexual comments to 13-year-old B.X. in 2008 or 2009.  Defendant also told A.D. that during a trip to Santa Cruz with B.X. he had " 'played with' " B.X.'s vagina and that her vagina was " 'very clean' " and " 'very tight.' "  A.D. overheard defendant say that he " 'likes young girls' " and " 'likes young pussy.' "

The court noted that the proffered evidence involved conduct similar to defendant's conduct with B. on girls who were of an age similar to B.'s at the time defendant molested her.  L.D., like B., was defendant's cousin, and defendant's activities with B.X. occurred during the same period as his molestations of B.  The court also observed that the evidence concerning L.D. and B.X. was not more

24

inflammatory than the current offenses as it involved less serious conduct. Due to the fact that B.X. would not be testifying (since her identity was unknown), the court was concerned that it was "a close call" as to whether the corpus delicti rule applied to the potential admission of evidence concerning her as Evidence Code section 1108 evidence. As there was a case on point that the corpus delicti rule did not apply to Evidence Code section 1101, subdivision (b) evidence, the court ruled that the prosecution would not be permitted to present evidence concerning defendant's conduct with B.X. under Evidence Code section 1108 but could present it under Evidence Code section 1101, subdivision (b). As to the evidence concerning L.D., the court exercised its discretion and permitted the prosecution to introduce that evidence only under Evidence Code section 1101, subdivision (b) because it felt "more comfortable" with that than with admitting it under Evidence Code section 1108.

The court made Evidence Code section 352 findings similar to those it had made with regard to the Evidence Code section 1108 evidence: it found that the prior offenses involved similarly aged young girls who were not strangers to defendant, and similar conduct, which was not more inflammatory than the charged offenses, and that the prior conduct was not remote. The court also permitted the prosecution to introduce the statements by defendant regarding his sexual interest in young girls under Evidence Code section 1101, subdivision (b) over the defense's objection that their only relevance was to defendant's propensity.

L.D. and A.D. testified at trial as we have recounted earlier, much as the prosecution had proposed. At the instruction conference, the defense agreed that the jury should be instructed that this evidence could be used to show intent, but the parties disagreed as to whether the jury should be instructed that it could be used for motive and common scheme or plan. The court instructed the jury that the testimony of A.D. and L.D. could be used for all three purposes. "[Y]ou may, but are not required to, consider that evidence for the limited purpose of deciding whether:

25

[¶]  A.  The defendant acted with the intent, motive, or common plan and scheme to commit" the charged lewd act offenses.  "Do not consider this evidence for any other purpose, unless I specifically instruct you otherwise.  [¶]  Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."

### 2.    Analysis

Defendant argues that the trial court abused its discretion in admitting the prior act evidence under Evidence Code section 1101, subdivision (b) because his "intent" and "motive" were "never in dispute" as his acts on B. were all "sexual in nature."[12] He claims that the prior act evidence was therefore cumulative and should have been excluded under Evidence Code section 352.

"Evidence Code section 1101, subdivision (a) generally prohibits the admission of evidence of a prior criminal act against a criminal defendant 'when offered to prove his or her conduct on a specified occasion.'  Subdivision (b) of that section, however, provides that such evidence is admissible when relevant to prove some fact in issue, such as motive, intent, knowledge, identity, or the existence of a common design or plan.  [¶]  'The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' [Citation.]  Evidence may be excluded under Evidence Code section 352 if its

---

[12] Evidence Code section 1101 provides:  "(a) Except as provided in this section and in [s]ections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.  [¶]  (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."  (Evid. Code, § 1101.)

probative value is 'substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citation.] 'Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 22-23.) " 'On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion.' " (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 203.)

Defendant does not address the admissibility of this prior act evidence to show *a common design or plan*. The Attorney General contends that it was admissible to show a common design or plan. We agree.

"[E]vidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 401-402.) "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.] [¶] A greater degree of similarity is required in order to prove the existence of a common design or plan[:] . . . evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.] '[T]he difference between requiring similarity, for acts negativing innocent intent, and requiring common features indicating common design, for acts showing design, is a difference of degree rather than of kind; for to be similar involves having common features, and to have common features is merely to have a high degree of similarity.' [Citations.] [¶] To establish the existence of a common design or plan, the common features must

27

indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Id.* at pp. 402-403.)

A.D.'s testimony about defendant's statements about young girls and about his conduct with B.X. coupled with L.D.'s testimony about his interaction with her demonstrated that defendant was acting in accordance with a common plan rather than engaging in "a series of similar spontaneous acts." Defendant did not merely act spontaneously. He pursued relationships with these young girls (exchanging letters with L.D.; talking to B.X., cuddling with her under a blanket, and later taking her on a trip; bonding with B. over video gaming and buying her gifts) as part of his plan to use these relationships as leverage to gain sexual access to their young bodies. The similar ages of the girls, his familial or near-familial relationships with them (B. and L.D. were both his cousins, and B.X. was his cousin's friend), and the similarity in the conduct (fondling B.'s breasts and expressing the desire to fondle L.D.'s breasts, digitally penetrating B. and B.X.) established that the prior and current acts were sufficiently similar to merit admission under Evidence Code section 1101, subdivision (b) to show his common scheme or plan. The fact that defendant also repeatedly proclaimed his desire for young girls' bodies and "young pussy" only enhanced the evidence that he had a common plan to gain access to those young bodies.

Defendant's reliance on *People v. Balcom* (1994) 7 Cal.4th 414 is misplaced. In *Balcom*, the California Supreme Court held that the prior conduct was not admissible to show *intent* because it would have been merely cumulative on that point, but the court held that the prior conduct *was* admissible to show *common scheme or plan*.[13] (*Id.* at pp. 423-424.) As the court pointed out, "[e]vidence that the defendant

---

[13] Defendant's claim also finds no support in this court's decision in *People v. Lopez* (2011) 198 Cal.App.4th 698. In *Lopez*, this court found the prior act evidence inadmissible to show intent because, as in *Balcom*, the perpetrator's intent was

possessed a plan to commit the type of crime with which he or she is charged is relevant to prove the defendant employed that plan and committed the charged offense." (*Id.* at p. 424.) That is precisely the case here. Defendant planned to take sexual advantage of his young female relatives and their friends (L.D., B.X., M.D., and J.D.) by developing relationships with them and leveraging those relationships, and he employed that plan when he sexually abused B.

Since the prior act evidence was admissible to show defendant's common design or plan, we need not address defendant's claim that it was inadmissible to show intent or motive. Defendant does not argue that the instruction permitting the jury to consider it for all three purposes was prejudicial if the evidence was admissible only to show his common scheme or plan.[14] His contention is solely that the evidence should not have been admitted at all.

The remaining question is whether the trial court abused its discretion under Evidence Code section 352 in admitting this evidence. His sole argument on the Evidence Code section 352 issue in his opening brief is that the evidence should have been excluded because it was "cumulative," which is premised on his claim that it was admitted only on intent and motive. Since it was admitted to show common design or

---

"beyond dispute." (*Id*. at p. 715.) *Lopez* did not concern evidence that was admitted to show a common scheme or plan.

[14] A trial court's error in admitting prior act evidence under Evidence Code section 1101, subdivision (b) does not require reversal unless it meets the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Malone* (1988) 47 Cal.3d 1, 22.) Reversal is required "only when . . . it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.) " ' " '[A] "probability" in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility*.' [Citation.]" ' [Citation.]" (*People v. Wilkins* (2013) 56 Cal.4th 333, 351.) Defendant, who does not even acknowledge that this evidence was admitted to show common scheme or plan, does not argue that limiting the use of this evidence to common scheme or plan would have made any difference in the outcome.

plan, this argument lacks merit. In his reply brief, defendant argues that this prior act evidence was unduly prejudicial because he had not been punished for the prior acts, and therefore there was "a substantial risk that the jury would incorrectly infer his guilt of the currently charged offenses to punish him for the prior" acts. We see no abuse of discretion in the trial court's conclusion that this was unlikely in this case. Defendant had already been punished for the two convictions that were introduced as Evidence Code section 1108 evidence, and, given the fact that the jury was instructed on the limited use of the Evidence Code section 1101, subdivision (b) evidence and that these prior acts were far less serious than the current offenses, it was unlikely that the jury would do as he suggests. The trial court did not abuse its discretion under Evidence Code section 352 in admitting this prior act evidence.

## F.      CALCRIM No. 1193

Defendant claims that the trial court prejudicially erred in giving the standard version of CALCRIM No. 1193 because this instruction told the jury that it could use the CSAAS evidence "in evaluating the believability of [B.'s] testimony."

### 1.      Background

The defense sought to preclude the prosecution from presenting expert CSAAS testimony. It claimed that the proposed testimony was irrelevant, unduly prejudicial, and not a proper subject for expert testimony. The defense also argued that the voir dire of the jurors demonstrated that none of them suffered from any misconceptions so the evidence was irrelevant. In addition, the defense asked the court to instruct the jury with CALJIC No. 10.64 prior to the CSAAS testimony if that testimony was admitted. CALJIC No. 10.64 does not instruct the jury that it can use CSAAS evidence in "evaluating the believability" of the child-witness's testimony.

The court found the CSAAS testimony admissible and denied the defense motion to exclude it. The court declined to instruct with CALJIC No. 10.64 but agreed to instruct the jury with CALCRIM No. 1193. At the close of trial, the defense

30

reiterated its request for CALJIC No. 10.64, but after the court denied that request it submitted as to CALCRIM No. 1193.

Blake Carmichael testified about CSAAS. Before Carmichael's testimony, the court instructed the jury with CALCRIM No. 1193. Carmichael testified that CSAAS was intended to "help people understand why kids might do something you might not expect or hope they might do after being sexually abused." He explained that CSAAS should not be used "to decide if a kid was abused or not." "It's used to help people understand why certain things could happen for kids who have been sexually abused."

At the conclusion of the trial, the trial court again instructed the jury with CALCRIM No. 1193: "You have heard testimony from Dr. Blake Carmichael regarding [CSAAS]. [¶] [His] testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [B.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

The prosecutor did not mention the CSAAS evidence in her opening argument to the jury, but defendant's trial counsel brought it up in her argument. Defendant's trial counsel argued that Carmichael's testimony "doesn't really apply" because it "doesn't help us . . . determine whether . . . B[.] is telling the truth." She observed that CSAAS was an "educational tool" that "start[s] with" "the assumption that the child was abused." She pointed out that this was not what the jury should do because defendant was "presumed innocent." She noted that CSAAS is "not a diagnostic tool." "So this evaluation tool isn't applicable to the circumstances of this case because we don't have a known victim of sexual assault, and Dr. Carmichael told us that it can't and shouldn't be used to decide if a person was the victim of a sexual assault." The prosecutor briefly mentioned the CSAAS evidence in her closing argument. She

31

asserted that CSAAS was relevant to help the jury determine "whether or not what they are saying is inconsistent with" being a sexual abuse victim.

### 2.    *Analysis*

Defendant's challenge to CALCRIM No. 1193 is essentially identical to the challenge made by the defendant in *People v. Brackins* (2019) 37 Cal.App.5th 56 (*Brackins*) to CALCRIM No. 850.  CALCRIM No. 850, much like CALCRIM No. 1193, tells the jury that it may use expert testimony about intimate partner violence (formerly known as Battered Women's Syndrome) in evaluating whether the victim's " 'conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of her testimony.' " (*Brackins*, *supra*, at pp. 68-69.)  The defendant claimed that by instructing the jury that it could use the expert testimony in evaluating the victim's "believability," the court was erroneously permitting the jury to use the "testimony to 'prove the occurrence' of the abuse." (*Id.* at p. 71.)  This court rejected the challenge.  "We reject this premise because it presumes that expert testimony that may be used by the jury to assist it in evaluating the credibility of an alleged abuse victim is prohibited evidence of whether the abuse occurred.  If the expert testimony was not related in some way to whether the abuse occurred, it would be irrelevant.[15]  Expert testimony may not be improperly used to *directly* determine whether the abuse occurred.  But like much of the other evidence that comes in at a trial, it may be used *indirectly* to assist the jury in evaluating whether the alleged victim's statements are believable." (*Ibid.*)  The same is true here.  CALCRIM No. 1193 properly told the jury that it could use Carmichael's testimony in evaluating the believability of B.'s testimony.

----

**15** As noted in *Brackins*, "All evidence, including expert testimony, must have some relation to whether the charged offenses occurred or it would be irrelevant and excluded." (*Brackins*, *supra*, 37 Cal.App.5th at p. 72.)

Defendant takes issue with the Second District Court of Appeal, Division Six's analysis in *People v. Gonzales* (2017) 16 Cal.App.5th 494 of a similar challenge to CALCRIM No. 1193. The *Gonzales* court found that CALCRIM No. 1193 properly permitted the jury to use the CSAAS evidence to "neutralize[] the victim's apparently self-impeaching behavior." (*Gonzales*, at p. 504; accord *People v. Munch* (2020) 52 Cal.App.5th 464, 474 [agreeing with the analysis in *Gonzales*].) We find nothing improper in that analysis, and we agree that CALCRIM No. 1193 properly permits the jury to use the CSAAS evidence in its evaluation of the believability of the victim's testimony. We therefore reject defendant's claim that CALCRIM No. 1193 is infirm in this respect.

### G. *Prosecutorial Misconduct*

Defendant claims that the prosecutor erred during closing argument by vouching for B.'s credibility.

#### 1. *Background*

The court told the jury repeatedly: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." "You alone must judge the credibility or believability of the witness."

The prosecutor explained in her argument to the jury that it was the jury's job to evaluate a witness and determine whether the witness was telling the truth. The prosecutor went over the factors set forth in CALCRIM No. 226 that are relevant to witness credibility. After going through these factors, the prosecutor said: "So I want to start with B[.] B[.] gave you sincere and credible testimony. She remembered significant facts in detail, while at the same time, not remembering things that you wouldn't expect her to remember. [¶] I want to contrast this for a moment with the defendant . . . . B[.] remembered significant details of significant events." Defendant's trial counsel did not object to this argument. The prosecutor argued that

B.'s "demeanor" when she testified demonstrated that she was credible. She also argued that B. "has absolutely no reason to lie" because there was no evidence of any animosity between her and defendant. Defendant's trial counsel objected to the prosecutor's argument that B. had "no reason to lie." She contended that this was improper vouching. The court found no vouching and overruled the objection. The prosecutor also argued that "ultimately, you know that the defendant is guilty because of B[.]'s sincere and heartfelt testimony."

### 2. Analysis

Defendant argues that the prosecutor improperly vouched for B.'s credibility by arguing that she had "no reason to lie" and that " 'you know that the defendant is guilty because of B[.]'s sincere and heartfelt testimony.' "

"Impermissible vouching occurs when 'prosecutors [seek] to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.) However, " ' "[a] prosecutor is given wide latitude to vigorously argue his or her case" ' [citation] and ' "may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " ' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)

Defendant claims that the prosecutor's argument "went beyond the evidence in the record and personally vouched for the honesty of [B.]" and "actually assured the jurors that h[er] witness was testifying honestly." He insists that "the prosecutor was not commenting on the state of the evidence, but was expressing the prosecutor's personal opinion."

34

We find nothing in the record to support defendant's claim that the jury would have understood the prosecutor to be relying on her personal opinion or matters outside the record when she made the challenged comments. The prosecutor expressly urged the jury to find that B.'s testimony was "sincere and credible" based on B.'s demeanor and the relevant factors under CALCRIM No. 226. The jury clearly would have understood the prosecutor's later comment on B.'s "sincere and heartfelt" testimony to be based on the same proper considerations, not the prosecutor's personal belief or any information outside the record. Similarly, the prosecutor argued that B. had "no reason to lie" because there was no evidence of any animosity between B. and defendant and even defendant had denied the existence of any. This argument too did not suggest that the prosecutor was relying on her personal belief or any information outside the record as it was explicitly grounded in the record. Accordingly, we find no merit in defendant's claim that the prosecutor improperly vouched for B.'s testimony.

## H.     Cumulative Prejudice

Defendant contends that the alleged errors were cumulatively prejudicial, but we have found only one nonprejudicial error. Hence, there is nothing to cumulate.

## I.     Cruel and Unusual Punishment

Defendant argues that his sentence of 900 years to life is unconstitutionally cruel and unusual because "it is an absurdity that serves no legitimate penal purpose."

He contends that "[a] sentence that no human being could conceivably complete serves no rational legislative purpose, under either a retributive or a utilitarian theory of punishment." He posits that "a prison term that exceeds the lifespan of the defendant serves no retributive purpose that would not be served equally well by a life sentence."

### 1.     Background

Defendant filed a posttrial motion asking the court to strike the strike findings. He argued that failing to strike the strike findings would result in a sentence that

violated the Eighth Amendment's prohibition against cruel and unusual punishment. Defendant noted that striking the strike findings would still result in a sentence that exceeded 250 years to life. The probation report recommended a sentence of 900 years to life.

At the sentencing hearing, defendant's trial counsel argued that the strikes should be stricken due to "the age of the prior convictions" and the "change that he made in his life" after he was released from prison. She also argued that the court should consider her "cruel and unusual punishment argument" as a basis for striking the strikes. She asserted that "imposing the strike priors is unnecessary" and "psychologically problematic" for defendant.

The court found that the strike priors were not remote in light of the fact that defendant had been discharged from parole in 2005 and had begun his molestation of B. in 2008. The court also found that the current offenses were aggravated and showed that defendant posed "a greater degree of danger to society." It found no circumstances in mitigation. The court concluded that defendant "falls squarely within the spirit of the Three Strikes [l]aw" and refused to strike either of the strikes.

The court "impose[d] the term prescribed by law." Consecutive terms were required because "they are separate acts of violence, occurring on different dates and time[s]." The court imposed but stayed under section 654 a term of 45 years to life for each of the three aggravated sexual assault counts.[16] It imposed a term of 75 years to life for each of the 10 section 288, subdivision (a) counts and a term of 25 years to life for each of the six section 288, subdivision (c)(1) counts. The total term was 900 years to life. The court waived the fines and fees and stayed the restitution fund fine.

---

[16] The prosecutor had elected at trial to base the first three lewd act on a child under 14 counts on the same acts as the three aggravated sexual assault counts.

## 2. *Analysis*

Defendant premises his argument on Justice Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585 and a previous law review article, also written by Justice Mosk. In *Deloza*, the defendant had been sentenced to 111 years to life, and the California Supreme Court reversed the judgment because the trial court had been unaware of its discretion to impose concurrent rather than consecutive terms. (*Id*. at p. 600.) Justice Mosk did not take issue with the majority's holding. However, he wrote separately to note that was no "legal difference" between a sentence of 111 years and 30,000 years because both sentences were "impossible for a human being to serve." (*Id.* at p. 601.) He suggested that a sentence should either be life or life without possibility of parole, rather than a sentence that was "impossible" to serve. (*Id.* at pp. 600-602.)

Defendant cites no California case that has ever agreed with Justice Mosk's position. Although he acknowledges that his sentence was compelled by statute, he urges us to "consider" whether it "serve[s] any rational purpose." The two United States Supreme Court cases he cites are readily distinguishable. *Trop v. Dulles* (1958) 356 U.S. 86 concerned a punishment of loss of citizenship. *Coker v. Georgia* (1977) 433 U.S. 584 was a death penalty case. Challenges like defendant's have been repeatedly rejected by California Courts of Appeal on the ground that sentences exceeding a defendant's lifespan *do* serve a rational purpose. (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382-1383 [rejecting challenge to sentence of 115 years consecutive to 444 years to life]; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231 [rejecting challenge to sentence of 135 years to life]; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 568 [rejecting challenge to sentence of 210 years to life].) "[A] sentence such as the one imposed in this case serves valid penological purposes: it unmistakably reflects society's condemnation of defendant's conduct and it provides a strong psychological deterrent to those who would consider engaging in that sort of

37

conduct in the future." (*Byrd*, at p. 1383.) "[T]he likelihood that he may not serve the entirety of the sentence does not, in our view, make the punishment inappropriate under the circumstances. 'In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life.' " (*Sullivan*, at p. 572.)

We agree with the other courts that have considered this issue that a sentence beyond the span of a human life still serves the legitimate purpose of demonstrating society's extreme condemnation of highly culpable conduct and therefore does not impose cruel and unusual punishment, particularly since a defendant who receives such a sentence can spend no more than his or her entire life in prison. Consequently, we reject defendant's claim that his sentence is unconstitutional because it exceeds his lifespan.

### J.      *Remand for Application of Amended Version of Section 654*

The prosecutor elected to base counts 4, 5, and 6 on the same acts as counts 1, 2, and 3. Defendant was found guilty of both sets of counts. Counts 1, 2, and 3 were each punishable by a term of 45 years to life, while counts 4, 5, and 6 were each punishable by a term of 75 years to life. At the time of sentencing, former section 654 provided: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that *provides for the longest potential term of imprisonment*, but in no case shall the act or omission be punished under more than one provision." (Stats. 1997, ch. 410, § 1, italics added.) Consequently, the trial court was required to impose the terms of 75 years to life rather than the terms of 45 years to life for these acts.

Effective January 1, 2022, section 654 now provides: "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a), italics added.) Thus, a trial court now has

38

discretion to choose either the longer or the shorter term of imprisonment for an act that is punishable in two different ways.

Defendant contends, and the Attorney General concedes, that the amendment of section 654 is retroactive to all cases, like his, that were not final as of January 1, 2022. We agree. The "inference of retroactivity" under the "*Estrada* rule" applies "to statutes that merely ma[k]e a reduced punishment *possible*," as amended section 654 does. (*People v. Frahs* (2020) 9 Cal.5th 618, 628-629.) Where an ameliorative statute like this one is retroactive, a remand is appropriate unless "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 (*Gutierrez*).) The record in this case contains no indication as to whether the trial court would have imposed the longer terms if it had understood that it had a choice. Accordingly, we remand to give the trial court the opportunity to exercise its discretion under the amended version of section 654.

## IV. DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court for the sole purpose of permitting the court to exercise its discretion under the amended version of section 654. If the court decides to impose the same sentence as it did originally, it shall reinstate the judgment. If the court decides otherwise, it shall resentence defendant.

_____

ELIA, ACTING P.J.

WE CONCUR:

_____

LIE, J.

_____

WILSON, J.

*People v. Romero*
H047034